No. 21-55981

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————

**STEVE MARQUEZ,**
*Plaintiff-Appellee,*

*v.*

**C. RODRIGUEZ and L. KELLY,**
*Defendants-Appellants.*

———————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA
CASE NO. 3:18-CV-0434-CAB-NLS

———————

**APPELLEE'S ANSWERING BRIEF**

———————

<table>
<tr><td><strong>RIGHTS BEHIND BARS</strong><br>OREN NIMNI<br>SAMUEL WEISS<br>416 FLORIDA AVENUE NW, STE. 26152<br>WASHINGTON, D.C. 20001<br>(202) 455-4399</td><td><strong>UCLA SCHOOL OF LAW</strong><br><strong>PRISONERS' RIGHTS CLINIC</strong><br>AARON LITTMAN<br>HOPE BENTLEY<br>(CERTIFIED LAW STUDENT)<br>RONAK PATEL<br>(CERTIFIED LAW STUDENT)<br>385 CHARLES E. YOUNG DRIVE E<br>LOS ANGELES, CALIFORNIA 90095<br>(310) 825-9562</td></tr>
</table>

COUNSEL FOR PLAINTIFF-APPELLEE
**STEVE MARQUEZ**

# TABLE OF CONTENTS

TABLE OF CONTENTS .......................................................................... II

TABLE OF AUTHORITIES ................................................................... IV

INTRODUCTION ................................................................................. 1

JURISDICTIONAL STATEMENT ........................................................ 3

STATEMENT OF ISSUES PRESENTED .............................................. 4

STATEMENT OF THE CASE ............................................................... 5

SUMMARY OF ARGUMENT ............................................................. 14

STANDARD OF REVIEW .................................................................. 16

ARGUMENT ...................................................................................... 16

I. MR. MARQUEZ HAS STATED A *BIVENS* CLAIM. .................................. 17

A. A *BIVENS* CAUSE OF ACTION EXISTS IF A CLAIM ARISES WITHIN AN EXISTING *BIVENS* CONTEXT AS RECOGNIZED BY THE SUPREME COURT, OR IF AN EXTENSION IS WARRANTED. ................................................................................................ 17

B. MR. MARQUEZ'S CLAIM FALLS WITHIN AN EXISTING *BIVENS* CONTEXT. ......... 17

II. EVEN IF MR. MARQUEZ'S CLAIM MODESTLY EXTENDS *BIVENS*, NO SPECIAL FACTORS COUNSEL HESITATION BEFORE RECOGNIZING A CAUSE OF ACTION FOR PRISON GUARDS' FAILURE TO PROTECT A PRISONER AGAINST A SUBSTANTIAL RISK OF HARM AT THE HANDS OF OTHERS. ................................................................................................ 25

A. THE NINTH CIRCUIT HAS APPROVED OF BIVENS EXTENSIONS LESS MODEST THAN ANY REQUIRED FOR MR. MARQUEZ'S CLAIM TO PROCEED. ......................... 25

B. ALTERNATIVE REMEDIES ARE NOT AVAILABLE. .............................................. 27

C. LEGISLATIVE ACTION DOES NOT SUGGEST THAT CONGRESS DOES NOT WANT A DAMAGES REMEDY FOR FAILURE-TO-PROTECT CLAIMS. ........................................ 31

D. ALLOWING SUCH CLAIMS TO PROCEED DOES NOT RISK UNDUE IMPACT ON GOVERNMENTAL OPERATIONS. ........................................................................ 36

III.   DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY. ......................... 37

A.   QUALIFIED IMMUNITY DOES NOT PROTECT DEFENDANTS WHO VIOLATE CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS OF INCARCERATED PEOPLE. ..... 37

B.   MR. MARQUEZ HAD A CLEARLY ESTABLISHED CONSTITUTIONAL RIGHT TO BE PROTECTED FROM VIOLENCE AT THE HAND OF OTHER DETAINEES. ........................ 38

C.   DEFENDANT RODRIGUEZ VIOLATED MR. MARQUEZ'S CLEARLY ESTABLISHED RIGHT BY FAILING TO TAKE REASONABLE MEASURES TO PROTECT HIM FROM AN OBVIOUS RISK OF SERIOUS HARM. ............................................................................ 41

D.   DEFENDANT KELLY VIOLATED MR. MARQUEZ'S CLEARLY ESTABLISHED RIGHT BY FAILING TO TAKE REASONABLE MEASURES TO PROTECT HIM FROM AN OBVIOUS AND ALREADY REALIZED RISK OF SERIOUS HARM. .................................................. 49

IV.   MR. MARQUEZ ALLEGES INJURIES CAUSED BY DEFENDANT KELLY'S DECISION TO RETURN HIM TO GENERAL POPULATION AFTER HIS RETURN FROM THE HOSPITAL SUFFICIENT TO SUPPORT LIABILITY. ...................................................................... 50

**CONCLUSION** ............................................................................................... **56**

iii

# TABLE OF AUTHORITIES

**Cases**

*Abreu v. Nichols*, 2011 WL 1044373 (S.D.N.Y. Mar. 22, 2011) ...................................................56

*Ashcroft v. al–Kidd*, 563 U.S. 731 (2011) ...............................................38

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......................................................4

*Attkisson v. Holder*, 925 F.3d 606 (4th Cir. 2019) ........................................22

*Babcock v. White*, 102 F.3d 267 (7th Cir. 1996) ..........................................50

*Bagola v. Kindt*, 131 F.3d 632 (7th Cir. 1997) ...........................................36

*Benefield v. McDowall*, 241 F.3d 1267 10th Cir. 2001) ...........................................36, 51

*Bishop v. Hackel*, 636 F.3d 757 (6th Cir. 2011) ...........................................41

*Bistrian v. Levi*, 912 F.3d 79 (3d Cir. 2018) ...........................................passim

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, (1971)...15, 29

*Brooks v. Warden*, 800 F.3d 1295 (11th Cir. 2015) ........................................47

*Brown v. Matevousian*, 2021 WL 1210002, (E.D. Cal. March 31, 2021)...................................20

*Burnam v. Smith*, 787 F. App'x 387 (9th Cir. 2019) ........................................20

*Caldwell v. Warden*, 748 F.3d 1090 (11th Cir. 2014) .......................................36

*Calhoun v. DeTella*, 319 F.3d 936 (7th Cir. 2003).........................................51

*Carlson v. Green*, 446 U.S. 14 (1980)..................................................passim

*Castro v. Cnty. of L.A.*, 833 F.3d 1060 (9th Cir. 2016) ...........................24, 39, 40, 41

*Corr. Serv. Corp. v. Malesko*, 534 U.S. 61 (2001) ......................................19, 29

*Darnell v. Pineiro*, 849 F.3d 17 (2d Cir. 2017) ...........................................40

*Davis v. Passman*, 442 U.S. 228 (1979).....................................................17

*Dennis v. Westchester Cnty. Jail Corr. Dep't*, 485 F. App'x 478 (2d Cir. 2012) .......................41

*Doreh v. Rodriguez*, 723 F. App'x 530 (9th Cir. 2018) ......................................20

*Dorsey v. Washington*, 2017 WL 4741104 (N.D. Ill. Oct. 20, 2017)...........................................51

*Doty v. Hollingsworth* 2018 WL 1509082 (D.N.J. Mar. 27, 2018).............................................23

*Earle v. Shreves*, 990 F.3d 774, 778 n.1 (4th Cir. 2021)......................................22

*Farmer v. Brennan*, 511 U.S. 825 (1994)..............................................passim

*Fleming v. Reed*, 2019 WL 4196322 (C.D. Cal. July 23, 2019) ...............................23

*Garraway v. Ciufo*, 2020 WL 860028 (E.D. Cal. Feb. 21, 2020) ................................20

*Gaut v Sunn*, 810 F.2d 923 (9th Cir. 1987) ...............................................52

*Gaut v. Sunn*, 792 F.2d 874 (9th Cir. 1986) ..............................................53

*Gevas v. McLaughlin*, 798 F.3d 475 (7th Cir. 2015).........................................41

*Gillespie v. Civiletti*, 629 F.2d 637 (9th Cir. 1980).........................................36

*Glaze v. Byrd*, 721 F.3d 528 (8th Cir. 2013) ..........................................41, 45

*Gordon v. Cnty. of Orange*, 888 F.3d 1118 (9th Cir. 2018).....................................40

*Green v. City of New York Dep't of Corr.*, 2008 WL 2485402 (S.D.N.Y. June 19, 2008)...........52

*Gulatte v. Potts*, 654 F.2d 1007 (5th Cir. 1981) ...........................................43

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982).................................................38

*Hebbe v. Pliler*, 627 F.3d 338 (9th Cir. 2010).............................................16

*Helling v. McKinney*, 509 U.S. 25 (1993) ....................................................................51, 52

*Hernandez v. Mesa*, 137 S. Ct. 2003 (2017) ...............................................................passim

*Hoffman v. Preston*, 26 F.4th 1059 (9th Cir. 2022)......................................................passim

*Hundley v. Parker*, 69 F.3d 537 (6th Cir. 1995)..................................................................49

*Hyde v. City of Willcox*, 23 F.4th 863 (9th Cir. 2022).........................................................16

*Jacobs v. Alam*, 915 F.3d 1028 (6th Cir. 2019)..................................................................36

*Kreines v. United States*, 33 F.3d 1105 (9th Cir. 1994) ......................................................37

*Lanuza v. Love*, 899 F.3d 1019 (9th Cir. 2018)............................................................27, 31

*Lee v. Matevousian*, 2018 WL 5603593 (E.D. Cal. Oct. 26, 2018) ....................................23

*Lineberry v. Johnson*, WL 4232907 (S.D. W. Va. Aug. 10, 2018).....................................23

*Lorillard v. Pons*, 434 U.S. 575 (1978).............................................................................32

*McAdoo v. Martin*, 899 F.3d 521 (8th Cir. 2018)................................................................55

*McDaniels v. United States*, 2018 WL 7501292 (C.D. Cal. Dec. 28, 2018)................................22

*Mohamed v. Jones*, 2022 WL 523440 (D. Colo. Feb. 22, 2022)........................................23

*Morris v. Burrkhouse*, 2021 WL 2119497 (C.D. Cal. Mar. 24, 2021) ...........................44

*Nailing v. Fosterer*, 2012 WL 1130655 (E.D. Cal. Mar. 2, 2012) ...................................44

*Neal v. Shimoda*, 131 F.3d 818 (9th Cir. 1997)..................................................................44

*Oliver v. Keller*, 289 F.3d 623 (9th Cir. 2002) ...................................................................56

*Pearson v. Callahan*, 555 U.S. 223 (2009) ........................................................................38

*Peterson v. Martinez*, 2020 WL 4673953 (N.D. Cal. Aug. 12, 2020)................................20

*Peterson v. Putnam*, 2021 WL 1550465 (9th Cir. Feb. 8, 2021).......................................20

*Powell v. Sheriff, Fulton Cty. Georgia*, 511 F. App'x 957 (11th Cir. 2013)................................48

*Renchenski v. Williams*, 622 F.3d 315 (3d Cir. 2010) ........................................................44

*Riggs v. Berkebile*, 427 F. Supp. 3d 1266 (D. Mont. 2019) .........................................45, 49

*Roman v. Wolf,* 977 F.3d 935 (9th Cir. 2020) .....................................................................40

*Royer v. Fed. Bureau of Prisons*, 933 F. Supp. 2d 170  (D.D.C. 2013)......................................34

*Rupe v. Cate*, 688 F. Supp. 2d 1035 (E.D. Cal. 2010)........................................................56

*Sealock v. Colorado*, 218 F.3d 1205 (10th Cir. 2000) ........................................................55

*Shields-Nordness v. Galindo*, 2019 WL 1003114 (D. Minn. Mar. 1, 2019) ...............................48

*Shorter v. United States*, 12 F.4th 366 (3rd Cir. 2021) .................................................22, 46

*Smith v. Shartle*, 2021 WL 842144 (D. Ariz. March 5, 2021) ............................................20

*Smith v. Torres*, 2019 WL 4139275 (E.D. Cal. Aug. 30, 2019).........................................47

*Smith v. United States*, 561 F.3d 1090 (10th Cir. 2009)......................................................36

*Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76 (6th Cir. 1995) ...............................................43

*Vega v. United States*, 881 F.3d 1146 (9th Cir. 2018)........................................................16

*Walker v. Schult*, 463 F. Supp. 3d 323 (N.D.N.Y. 2020) ..................................................22

*Washington v. Fed. Bureau of Prisons*, 2018 WL 6061039 (D.S.C. Nov. 20, 2018) ..................35

*Webster v. Doe*, 486 U.S. 592(1988).................................................................................34

*Wilk v. Neven*, 956 F.3d 1143 (9th Cir. 2020)...................................................38, 41, 45, 50

*Williams v. Allison*, 2021 WL 5450201 (E.D. Cal. Nov. 22, 2021) ...............................44

*Williams v. Gerber Prod. Co.*, 552 F.3d 934 (9th Cir. 2008)..........................................................4

*Woody v. U.S. Bureau of Prisons*, 2016 WL 7757523 (D. Minn. Nov. 22, 2016).......................35

*Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017)...............................................................................passim

**Statutes and Regulations**

18 U.S.C. § 3625 ...........................................................................................................................33

18 U.S.C. § 4081 ...........................................................................................................................34

18 U.S.C. §§ 3621(b)....................................................................................................................33

28 U.S.C. § 1291 .............................................................................................................................4

28 U.S.C. § 1331 .............................................................................................................................4

42 U.S.C. § 1997e(e) ...............................................................................................................31, 55

**Other Authorities**

141 Cong. Rec. H14078-02 (daily ed. Dec. 6, 1995) (statement of Rep. Lobiondo)....................32

Brief for Dee Farmer et al., as Amici Curiae Supporting Neither Party, *Egbert v. Boule*, 142 S. Ct. 457 (2021) (No. 21-147).......................................................................................................19

Margo Schlanger, et al., *Incarceration and the Law: Cases and Materials*, Data Updated (April 2022).........................................................................................................................................37

S. Rep. No. 93-588 (1973).............................................................................................................36

S. Rep. No. 98-225 (1983).............................................................................................................35

*The Federal Tort Claims Act Intentional Torts Amendment: An Interpretive Analysis*, 54 N.C. L. Rev. 497 (1976) .......................................................................................................................35

**INTRODUCTION**

Federal jail officers have a well-settled constitutional obligation to protect detainees in their custody from assault. It is also well-settled that a detainee those officers fail to protect from an obvious risk of serious harm has a cause of action under *Bivens*. Recognizing as much, the district court correctly concluded that the pro se plaintiff in this case, Steve Marquez, had stated a *Bivens* claim, and that the defendant jail officers were not entitled to qualified immunity.

When Mr. Marquez was booked into a federal jail on sex-crime charges, he knew he would be at high risk of assault. He pleaded repeatedly with Defendant Rodriguez, the classification officer, to place him in protective custody. Defendant Rodriguez acknowledged that these fears were well-founded, mocking him and telling him to lie about his charges. Nonetheless, Defendant Rodriguez housed him in general population. Mr. Marquez was promptly attacked by a group of detainees, who forced him to exercise to the point of unconsciousness. Medical providers at the facility transferred him to an outside hospital for emergency treatment. He was diagnosed with acute kidney failure and informed that his condition was life-threatening. After a week of inpatient treatment, having lost 40 pounds since the attack, he was transferred back to the jail. Despite knowing about the attack and his grave injuries, Defendant Kelly returned Mr. Marquez to the same dormitory

where the attack occurred. His physical suffering and terror continued for another month until his charges were dismissed and he was transferred.

The district court correctly held that Mr. Marquez may proceed under *Bivens*. He brings a run-of-the-mill *Bivens* damages action against individual jail officers for their failure to protect him from attack. Although *Bivens* causes of action are not available for every violation of constitutional rights by a federal official, Mr. Marquez's claim falls neatly within an existing *Bivens* context. Under the Supreme Court's decisions in *Farmer v. Brennan* and *Carlson v. Green*, federal courts have, for decades, heard *Bivens* failure-to-protect claims brought by people in federal custody. *Farmer v. Brennan*, 511 U.S. 825 (1994); *Carlson v. Green*, 446 U.S. 14 (1980). Even after the Court expressed hesitation about creating new *Bivens* contexts in *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1864-65 (2017), most courts—including the only court of appeals to address the question—have concluded that failure-to-protect *Bivens* claims remain viable. *See Bistrian v. Levi*, 912 F.3d 79, 89-94 (3d Cir. 2018). Moreover, the district court correctly concluded that if Mr. Marquez's claim requires a modest extension of an existing *Bivens* context, no special factors counsel hesitation. No alternative remedies are available, Congress has not indicated its preference against damages actions, and allowing such claims to proceed under *Bivens* would have no undue impact on governmental operations.

The district court also correctly rejected the Defendants' argument that this case should be dismissed on qualified immunity grounds. It has long been clearly established by Supreme Court and Ninth Circuit precedent that officers have a duty to protect detainees from the violence of others. Specifically, the Constitution prohibits officers from exposing detainees to an obvious and substantial risk of serious harm. Contrary to Defendant Rodriguez's assertion, Mr. Marquez alleged a series of facts—including the officer's own crass and mocking statements— sufficient to conclude that the risk was obvious. Defendant Kelly's qualified immunity defense fares even worse. Unable to argue that the risk was not obvious because Mr. Marquez had already been attacked when she housed him, she argues that his claim against her fails because he avoided a second assault and did not suffer new physical injuries. This lucky escape might impact the amount of compensatory damages she owes him but has no effect on her liability, which arose when she acted with deliberate indifference to the obvious risk that he would again be harmed. Moreover, Mr. Marquez did allege ongoing physical and emotional harm following her decision to return him to general population.

This Court should affirm the district court's denial of Defendants' motion to dismiss and allow Mr. Marquez's claims to proceed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Mr. Marquez's claims pursuant to 28 U.S.C. § 1331. The courts of appeals have jurisdiction over appeals from all final decisions of the district courts under 28 U.S.C. § 1291, and "a district court's order rejecting qualified immunity at the motion-to-dismiss stage of a proceeding is a 'final decision' within the meaning of § 1291." *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009). An interlocutory appeal of the district court's denial of defendants' motion to dismiss is therefore proper. Whether a *Bivens* cause of action is available to Mr. Marquez is antecedent to the question of qualified immunity. *See Hernandez v. Mesa*, 137 S. Ct. 2003, 2006 (2017). Because this is an appeal from denial of a motion to dismiss, all allegations of material facts in the complaint must be assumed to be true and construed in the light most favorable to the plaintiff, Mr. Marquez. *See Williams v. Gerber Prod. Co.*, 552 F.3d 934, 936 (9th Cir. 2008). Defendants timely filed their notice of appeal. (ER-239.).

## STATEMENT OF ISSUES PRESENTED

1.      Whether the district court correctly concluded that Mr. Marquez stated a *Bivens* claim in alleging that defendant jail officers failed to protect him from an obvious and substantial risk that he would be attacked, either because this claim falls within a recognized *Bivens* context or because a modest extension is warranted.

4

2.      Whether the district court correctly concluded that defendants were not entitled to qualified immunity at the motion-to-dismiss stage.

## STATEMENT OF THE CASE

I.      **Mr. Marquez Requested Protective Custody Because His Alleged Sex Offense Left Him at High Risk of Physical Violence, and Defendant Rodriguez Acknowledged but Disregarded This Risk, Placing Him Instead in General Population.**

On or about August 13, 2016, Mr. Marquez was booked into the Metropolitan Correction Center (MCC) in San Diego, California, after having been arrested for an alleged sex offense. (ER-102, ¶ 7.) Mr. Marquez's initial classification interview was with Defendant Rodriquez, an officer at MCC. (ER-103, ¶ 9.) While reviewing Mr. Marquez's charges, Defendant Rodriguez joked sarcastically about Mr. Marquez's charges, saying, "what a great guy" and "what an upstanding citizen." *Id*.

Understanding that his charges made him highly vulnerable, Mr. Marquez asked Defendant Rodriguez to place him in protective custody. (ER-103, ¶ 11.) Defendant Rodriguez ignored Mr. Marquez's request and handed him an emergency contact form, saying, "[H]ere, this is for when something happens to you in prison." *Id*. Increasingly fearful that he would be harmed by other detainees in general population, Mr. Marquez asked Defendant Rodriguez again to be placed

5

in protective custody. (ER-103, ¶ 12.) Instead of granting this request, Defendant Rodriguez advised Mr. Marquez to lie to other detainees about his alleged crime, saying, "Don't worry about it, just tell the other inmates you['re] here for selling drugs." *Id*. Defendant Rodriguez then ended the classification interview and placed Mr. Marquez in general population, disregarding his repeated pleas for protection. (ER-104, ¶ 13.)

### II. Mr. Marquez Was Promptly Forced by Other Detainees to Exercise Until He Lost Consciousness and the Ability to Move His Legs and Urinated Blood.

Upon being housed in general population, Mr. Marquez was afraid for his life; he suffered night terrors and was therefore unable to sleep. (ER-104, ¶ 14.) His worst fears were soon realized when several detainees approached him. (ER-104, ¶ 15.) One grabbed his shoulder and said, "We are going to break you." *Id*. Another threatened that if Mr. Marquez did not comply with all their demands, they would take him into the restroom and "take care of him." *Id*.

The detainees took Mr. Marquez to the back corner of the dormitory and ordered him to perform squats unceasingly. (ER-104-105, ¶¶ 17-18.) As he squatted again and again, they yelled threats at him, reminding him what would happen if he stopped. *Id.* Mr. Marquez felt dizzy, became exhausted, and eventually collapsed, but he was forced to get up and continue squatting while the

detainees continued to shout at him. *Id*. When he became overwhelmed with fatigue and collapsed again, the other detainees laughed at him and forced him to get back up. *Id*. Mr. Marquez collapsed a third time in unbearable pain and drifted into and out of consciousness. *Id*.

As he lay on the ground, Mr. Marquez could not feel his legs. *Id*. The detainees laughed at him, made insulting comments, and left him there. *Id*. For thirty minutes, Mr. Marquez lay vulnerable on the ground, unable to move. (ER-105, ¶ 19.) Eventually, he made it back to his bunk and remained there until the next day. *Id*. He continued to experience pain and shortness of breath, and still could not move his legs. (ER-105-106, ¶ 19.) He vomited, urinated blood, and was unable to eat. *Id.*

### III. Mr. Marquez Required a Week of Inpatient Hospitalization to Treat the Life-Threatening Renal Failure That Resulted.

Mr. Marquez notified a jail official, explaining that he had been forced to exercise until he collapsed and describing his physical symptoms. (ER-106, ¶ 20.) The officer replied, "that's crazy," but took no action other than telling Mr. Marquez to make an appointment to be seen by medical staff. *Id*. Mr. Marquez was still in pain and continued to urinate blood, so he stopped a nurse on medication rounds and described his condition. *Id*. The nurse scheduled him for an appointment and drew his blood for tests. *Id*. The next day, Mr. Marquez received

more blood tests and was told that his condition was very serious. (ER-106, ¶ 21.) He was placed on an intravenous line for several hours, then sent back to his dormitory. *Id.* The next day, the nurse informed him that his condition had worsened further. (ER-107, ¶ 23.) He was again placed on an intravenous line for several hours, then sent him back to his dormitory, where he continued to wait in pain. (ER-107, ¶¶ 23-24.) The following day, medical staff told Mr. Marquez that his condition had become so serious that he needed to be treated urgently at an outside hospital. (ER-107, ¶ 25.) Mr. Marquez was rushed to Alvarado Hospital, where he underwent tests including x-rays, ultrasounds, and blood tests. (ER-107, ¶ 26.) He was put on another intravenous line for twenty-four hours. *Id*.

After a few days of testing, a nephrologist told Mr. Marquez that the physical torture he had endured had caused his kidneys to shut down. (ER-107-108, ¶ 27.) Specifically, he was diagnosed with rhabdomyolysis (muscle death) resulting in tubular necrosis and azotemia. (ER-108-109, ¶ 29.) The doctor informed him that he might need dialysis, and that there was a very real possibility he would die. (ER-108, ¶ 27.) Mr. Marquez was overwhelmed with emotion at this news and asked to speak to his family but was not permitted to do so. (ER-108, ¶ 27.) Mr. Marquez was also diagnosed with cardiovascular disease, including pulmonary edema (fluid in the lungs) and cardiomegaly (enlarged heart). (ER-108-109 ¶¶ 28-29.) After a week in the hospital, Mr. Marquez was transferred back to

MCC. (ER-109, ¶ 30.) He had lost forty pounds since being attacked. (ER-108, ¶ 28.).

> **IV. Upon His Return to the Jail, Defendant Kelly Disregarded the Demonstrated Risk That Mr. Marquez Would Suffer Serious Harm at the Hands of Other Detainees by Returning Him to General Population, Where He Continued to Suffer Both Physical and Emotional Injury.**

After he was discharged from the hospital and returned to MCC, Mr. Marquez was interviewed by Defendant Kelly, another classification officer. (ER-110, ¶ 30.) He told her about the victimization he had endured when placed in general population, his injuries, and the hospital treatment he had required as a result. *Id.* Once again, he asked to be placed in protective custody, but she returned him instead to the same dormitory where he had been attacked. *Id*. Mr. Marquez remained at MCC for another month, deeply fearful for his safety, until his charges were dismissed. (ER-109-110, ¶ 32-33.) He continued to see medical staff to monitor his condition. (ER-109-110, ¶ 32.) As a result of his return to the housing unit where he was grievously harmed, he suffered an array of physical symptoms, including diarrhea, fever, and pain in his stomach, back, leg, and testicles. *Id.* He also experienced intense emotional distress, night terrors, restlessness, confusion, loss of appetite, and weight loss. *Id.*

> **V. Mr. Marquez Filed a Pro Se Complaint, and the District Court Denied a Motion to Dismiss with Respect to His Individual-Capacity *Bivens* Claims Against Defendants Rodriguez and Kelly.**

Mr. Marquez filed a pro se complaint in February 2018 against the United States, the Federal Bureau of Prisons, MCC Warden David Young, and three unnamed prison officials in their individual and official capacities. (ER-186.)[1] Mr. Marquez filed an amended complaint on February 24, 2020, naming only the two defendant-appellants. (ER-101-118.) Defendants moved to dismiss his constitutional claims, contending that he had failed to state a cognizable *Bivens* claim and that they were entitled to qualified immunity. (ER-65-100.)

On July 6, 2021, the district court granted in part and denied in part Defendants' motion to dismiss. (ER-3-39.) It dismissed his claims against Defendants in their official capacities but allowed his *Bivens* claims against them in their individual capacities to proceed. *Id.*

At the outset, it concluded that Mr. Marquez's claim of deliberate indifference under the Fifth Amendment arose in a new *Bivens* context, outside of

---

[1] The court granted Mr. Marquez's motion to proceed in forma pauperis and dismissed some of Mr. Marquez's claims under the Prison Litigation Reform Act. Mr. Marquez agreed to proceed only on his constitutional claims against the unnamed defendants and his claim under the Federal Torts Claims Act (FTCA) against the United States. (ER-183.) The district court subsequently dismissed the FTCA claim on Defendants' motion based on the discretionary-function exception, finding that Defendants had not violated jail policy, which required a risk assessment but did not dictate a specific housing assignment. (ER-122-130 (citing 28 C.F.R. § 115.42)).

10

those already recognized by the Supreme Court. (ER-10-18.) The district court explained that although Mr. Marquez's claim was substantively similar to that advanced in *Carlson*, and the cases involved the same class of defendants (prison officials), the constitutional right violated was different because Mr. Marquez was a pretrial detainee. (ER-11.) Although it observed that the Ninth Circuit had not yet determined whether a Fifth Amendment failure-to-protect claim by a pretrial detainee represented a new *Bivens* context, the district court believed that this distinction in constitutional source was salient. (ER-12). And it rejected the Third Circuit's contrary holding in *Bistrian v. Levi*, 912 F.3d 79 (3rd Cir. 2018), that a failure-to-protect claim by a federal pre-trial detainee for assault by other inmates did not require extending *Bivens* to a new context, finding that the Supreme Court had not expressly held in *Farmer* that a *Bivens* cause of action was available in *Farmer* but "merely assumed it did," and that Mr. Marquez's claim was in any event different because he was a pretrial detainee rather than a sentenced prisoner. (ER-16-17.)

Having decided that a "modest extension" was necessary, the district court found that there were no special factors that counselled hesitation. (ER-18-19.) First, the court rejected Defendants' argument that because "Congress has extensively legislated on prison issues but has not authorized a damages remedy for the type of claim brought by Plaintiff," this silence should be understood to

imply disfavor. (ER-18.) Instead, it noted that Congress was well aware of the availability of *Bivens* actions to federal prisoners under *Farmer* and *Carlson* and decided not to "eliminate or repudiate" such claims, and that some federal legislation even contemplates the filing of *Bivens* actions by federal prisoners. (ER-20-21.) Second, the district court rejected Defendants' position that recognizing Mr. Marquez's ability to seek damages would burden the Bureau of Prisons and its employees, finding that a claim challenging jail policies might disrupt facility operations but that a claim challenging "merely the actions by the individual correctional officers" fell within the *Bivens* heartland. (ER-21-22.) Third, the court rejected Defendants' contention that administrative grievances and equitable relief were available to Mr. Marquez and constituted alternative remedial structures precluding extension of *Bivens*. It found that Defendants had not shown either form of relief was timely available to avert Mr. Marquez's risk or sufficient to redress the harms he suffered after the fact. (ER-23-27.) Finally, the district court found that Mr. Marquez appeared to allege a "run-of-the-mill failure to protect claim[] [like those] federal courts have routinely addressed for decades" (ER-27-29.) and ultimately determined that the record had not been sufficiently developed at the motion-to-dismiss stage to determine that a *Bivens* cause of action should not be available. (ER-18-29.)

The district court also rejected Defendants' contention that they were entitled to qualified immunity. The court found that Mr. Marquez had adequately alleged a constitutional violation, noting that his complaint included allegations sufficient to conclude that the risks he faced were obvious when Defendants refused to place him in protective custody. (ER-31-34.) The court next rejected Defendant Rodriguez's argument that the right to protection asserted by Mr. Marquez was not clearly established at the requisite level of specificity, concluding that he had plausibly alleged that he faced an obvious risk based on his membership in a class of those arrested for sex offenses. (ER-35.) It noted that in *Farmer*, the Supreme Court clearly established that an officer's failure to protect an incarcerated person from an obvious risk facing "all prisoners in his situation" violates the Constitution. *Id.* (citing *Farmer*, 511 U.S. at 842). And it observed that while factual development was necessary as to Mr. Marquez's allegations, they sufficed to defeat qualified immunity at the motion-to-dismiss stage. (ER 35-37.) Finally, the court rejected Defendant Kelly's argument that because Mr. Marquez was not attacked again following her decision to return him to general population, she was entitled to qualified immunity. (ER-37-39.) The Court treated this argument as one founded upon the Prison Litigation Reform Act's physical-injury requirement. *Id.* Although this requirement exists, the Court found Mr. Marquez had adequately alleged serious physical injuries occurring both before and after

13

Defendant Kelly returned him to general population. *Id.* It also noted, parenthetically, that the physical-injury requirement does not bar recovery of nominal and punitive damages for the constitutional violation itself, even when compensatory damages for mental and emotional injuries are precluded. (ER-38.).

Defendants filed this appeal September 7, 2021. (ER-239.)

## SUMMARY OF ARGUMENT

1.       Mr. Marquez's claims arise within a well-established *Bivens* context. In both *Carlson* and *Farmer*, the Supreme Court recognized a *Bivens* cause of action available against federal corrections officers who act with deliberate indifference to an incarcerated plaintiff's safety, including specifically by failing to protect him from a substantial risk that others will attack him. It is of no import that Mr. Marquez's claims arose under the Fifth Amendment, because the objective standard applicable to pretrial detainees' claims is more protective than the Eighth Amendment. Any treatment that violates a convicted prisoner's rights also violates a pretrial detainee's.

Even if Mr. Marquez's claim requires a modest extension of *Bivens*, no special factors counsel hesitation. This Court recently held that extension was warranted in *Hoffman*, a case brought by a federal prisoner against a guard who encouraged other prisoners to attack him. *Hoffman v. Preston*, 26 F.4th 1059, 1061

14

(9th Cir. 2022). The same result should obtain here. Mr. Marquez's claim is a run-of-the-mill challenge to the abusive conduct of individual line officers. This is also not a challenge to any agency policy, much less one that implicates national security or border policy as in *Abbasi* and *Hernandez*. As in *Hoffman*, neither administrative grievances nor actions for equitable relief would redress Mr. Marquez's injuries; he will get "damages or nothing." *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 410 (1971) (Harlan, J., concurring). Legislative action regarding federal detainees and their litigation confirms that Congress intended for such *Bivens* claims to remain available. And there is no risk that permitting *Bivens* failure-to-protect claims to proceed will unduly burden the administration of federal prisons, because this holding will merely preserve the longstanding status quo. Federal prisoners' *Bivens* failure-to-protect claims face daunting procedural hurdles, but they are a necessary safeguard against officer misconduct.

2.      Defendants are not entitled to qualified immunity. This Court has squarely held that a federal detainee's right to be protected from an obvious, substantial risk of serious harm at the hands of others is clearly established. Mr. Marquez's allegations are more than sufficient for a factfinder to conclude that the risk he faced was obvious to Defendant Rodriguez, who knew that he was vulnerable to attack due to his sex-offense charges and repeatedly still denied

15

protective custody, even though he made several statements acknowledging the likelihood of attack if others found out about Mr. Marquez's charges. The risk was even plainer when Defendant Kelly returned Mr. Marquez to the same dormitory where she knew he had already been attacked. That he was not brutalized for a second time may be relevant to the damages he receives, but it has no bearing on Defendant Kelly's liability for the physical and emotional injuries he suffered following his return from the hospital.

## STANDARD OF REVIEW

This Court reviews a district court's order denying a motion to dismiss based on qualified immunity de novo. *See Hyde v. City of Willcox*, 23 F.4th 863, 869 (9th Cir. 2022). The threshold question of whether a *Bivens* cause of action exists is a question of law and therefore also reviewed de novo. *See Vega v. United States*, 881 F.3d 1146, 1152 (9th Cir. 2018). In reviewing a denial to a motion to dismiss, the court "must take all factual allegations in the complaint as true." *Iqbal*, 556 U.S. at 678. Pro se complaints are to be construed liberally and "held to less stringent standards than formal pleadings drafted by lawyers." *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010) (citation omitted).

## ARGUMENT

16

**I.      Mr. Marquez Has Stated a *Bivens* Claim.**

      **A.      A *Bivens* Cause of Action Exists if a Claim Arises Within an Existing *Bivens* Context as Recognized by the Supreme Court, or if an Extension is Warranted.**

In *Abbasi*, the Supreme Court laid out a two-step analysis to determine whether a plaintiff may pursue a *Bivens* cause of action against a federal officer. *See* 137 S. Ct. at 1859-60. First, courts must determine whether the claim arises in a "new context"—that is, whether "the case is different in a meaningful way from previous *Bivens* cases decided by th[e] Court." *Abbasi*, 137 S. Ct. at 1859 (listing three such cases: *Bivens* itself, *Davis v. Passman*, 442 U.S. 228 (1979), and *Carlson*, 446 U.S. 14 (1980)). If not, a *Bivens* cause of action is available. If the case is determined to represent a new context, the analysis turns to whether there are "special factors counselling hesitation in the absence of affirmative action by Congress" before extending the *Bivens* cause of action.[2] *Id.* at 1857 (citation omitted).

      **B.      Mr. Marquez's Claim Falls Within an Existing *Bivens* Context.**

A failure-to-protect claim brought by a federal detainee is well-trodden *Bivens* ground. Well before *Abbasi* was decided, in *Farmer*, the Supreme Court

---

[2] Defendants correctly note two errors the district court made in applying this caselaw: *Abbasi*'s special-factors analysis does apply to claims that arose prior to its issuance, and the special-factors analysis is appropriate at the motion-to-dismiss stage. (AOB 23-26 (citing ER-29-30).)

ratified the availability of a *Bivens* cause of action for claims alleging prison

officials' failure to protect prisoners from a substantial risk of serious physical

harm at the hands of other prisoners. 511 U.S. at 825. This was nothing novel. The

Court had already expressly recognized the ability of federal prisoners to bring

deliberate indifference claims under *Bivens*, in *Carlson*, 446 U.S. at 14-15

(involving a claim of deliberate indifference to serious medical needs).

The plaintiff in *Farmer*, a federal prisoner, brought a *Bivens* claim against

federal prison officials, claiming that they acted with deliberate indifference by

placing her, a transgender woman, in a male prison's general population, where she

was at substantial risk of serious harm and where she was eventually beaten and

raped. 511 U.S. at 829-30. Substantively, the Court held that a prison official acts

with deliberate indifference when he or she "knows that inmates face a substantial

risk of serious harm and disregards that risk by failing to take reasonable measures

to abate it." *Id.* at 847. In finding for Farmer, neither the unanimous opinion of the

Court nor any of the three concurring Justices questioned her ability to bring a

claim under *Bivens*. Indeed, the Court expressly stated that the petitioner had "filed

a *Bivens* complaint, alleging a violation of the Eighth Amendment," and cited both

*Bivens* and *Carlson* as the bases of her claim. *Id.* at 830. The availability of a

*Bivens* cause of action was not called into doubt at oral argument, either; *Bivens*

was only mentioned once, when Justice Ginsburg confirmed that the plaintiff's

18

claim was under *Bivens*. Transcript of Oral Argument at 23, *Farmer*, 511 U.S. 825 (1994) (No. 92-7247).

The procedural history of *Farmer* and the Court's interpretation in subsequent *Bivens* cases also supports this reading. The *Farmer* plaintiff filed her failure-to-protect claim pursuant to *Carlson*. *See Farmer*, 511 U.S. at 830 (citing *Carlson*, 446 U.S. at 100, as the basis for plaintiff's claim); *see also* Brief for Dee Farmer et al., as Amici Curiae Supporting Neither Party, *Egbert v. Boule*, 142 S. Ct. 457 (2021) (No. 21-147), 2021 WL 6265495, at *5. Moreover, the Court decided *Farmer* in 1994, well after it had moved away from recognizing new *Bivens* contexts. *See Abbasi*, 137 S. Ct. at 1857. The Court in *Abbasi* stated that the Court has "consistently refused to extend *Bivens* to any new context . . . for the past 30 years"—the period during which *Farmer* was decided. *Id*. Likewise, the Court in *Malesko* stated that "[s]ince *Carlson* [it] ha[s] consistently refused to extend *Bivens* liability to any new context or category of defendants," further buttressing the position that *Farmer* is simply an application of *Carlson*. *Corr. Serv. Corp. v. Malesko*, 534 U.S. 61, 68 (2001). *Hernandez v. Mesa*, too, reaffirms this view of *Farmer*. Citing cases stretching back to 1983—yet omitting *Farmer*—the *Hernandez* Court noted that it has "for almost 40 years . . . consistently rebuffed requests to add to the claims allowed under *Bivens*." *Hernandez*, 140 S. Ct. at 743. In reviewing the development of its own *Bivens* jurisprudence, the

19

Supreme Court has thus consistently confirmed its view that *Farmer* is an application of *Carlson.*

A number of courts have concluded, since *Abbasi*, that *Farmer* was and remains a *Bivens* context. This Court itself has done so, albeit in unpublished opinions. *Burnam v. Smith*, 787 F. App'x 387, 390 (9th Cir. 2019) (concluding that "a *Bivens* cause of action exists [under *Farmer*] where prison officials failed to provide [a prisoner with] adequate protection from beatings and sexual attacks" (citation omitted)); *Doreh v. Rodriguez*, 723 F. App'x 530 (9th Cir. 2018) (reversing dismissal of a *Bivens* claim that defendants were deliberately indifferent to the safety of the incarcerated plaintiff). And district courts in the Ninth Circuit have likewise continued to recognize *Farmer* as a *Bivens* context.[3]

---

[3] *See Smith v. Shartle*, No. CV-18-00323-TUC-RCC, 2021 WL 842144 at *7–8 (D. Ariz. March 5, 2021)( recognizing that a failure-to-protect claim did not present a different Bivens context than Farmer and could therefore proceed); *Brown v. Matevousian*, No. 1:20-cv-00204-NONE-SAB (PC), 2021 WL 1210002, at *8 (E.D. Cal. March 31, 2021) (concluding that "Bivens extends to a failure to protect claim" as set out in Farmer); *Peterson v. Martinez*, No. 3:19-cv-01447-WHO, 2020 WL 4673953, at *7 (N.D. Cal. Aug. 12, 2020), *appeal dismissed sub nom. Peterson v. Putnam*, No. 20-17057, 2021 WL 1550465 (9th Cir. Feb. 8, 2021) (recognizing that "the Supreme Court recognized a Bivens damages remedy for Eighth Amendment failure-to-protect claims in Farmer"); *Garraway v. Ciufo*, No. 1:17-cv-00533-DAD-GSA (PC), 2020 WL 860028 at *2 (E.D. Cal. Feb. 21, 2020) ( finding that "[i]t would be incongruous to regard Farmer as a 'new context' when the Supreme Court in that case recognized a Bivens claim under the Eighth Amendment for a failure to protect an inmate from violence by other prisoners.").

The district court on the other hand, reasoned that because the Court in *Farmer* did not "specifically conclude[]" or "explicitly state[]" that a *Bivens* cause of action existed, *Farmer* does not represent a *Bivens* context and failure-to-protect claims present a new *Bivens* context under *Abbasi*. (ER-15-16.) This reasoning assumes the Court was willing to evaluate the standard by which the *Farmer* plaintiff's claim was to be evaluated but did not determine that she had stated a claim in the first place. This is directly at odds with the Court's *Bivens* jurisprudence, which makes clear that the ability of a plaintiff to bring a *Bivens* claim is "'antecedent' to the other questions presented." *Hernandez*, 137 S. Ct. at 2006 (quoting *Wood v. Moss*, 572 U.S. 744 757 (2014)). The Court in *Farmer* could not have acted as it did without finding that a valid *Bivens* claim had been pleaded.

The Third Circuit—the only one to reach the question of whether *Farmer* constitutes a *Bivens* context post-*Abbasi*—has held that it does, following this logic and concluding that "an inmate's claim that prison officials violated his Fifth Amendment rights by failing to protect him against a known risk of substantial harm does not present a new *Bivens* context." *Bistrian v. Levi*, 912 F.3d 79, 90 (3d Cir. 2018) (citing *Farmer*, 511 U.S. at 832-49). In *Bistrian*, the Third Circuit stated that "*Farmer* continues to be the case that most directly deals with whether a *Bivens* remedy is available for a failure-to-protect claim resulting in physical

injury." *Id.* at 91 (citing *Abbasi*, 137 S. Ct. at 832-34); *see also Shorter v. United States*, 12 F.4th 366, 373 (3rd Cir. 2021) (reaffirming the continued recognition of *Farmer* as a *Bivens* context).[4]

As the Third Circuit recognized in *Bistrian*, *Abbasi* likely did not identify *Farmer* as a separate *Bivens* context because the *Abbasi* Court —like the *Farmer* Court itself—understood the *Farmer* plaintiff's failure-to-protect claim in *Farmer* to fall within the scope of *Carlson*. *See Bistrian*, 912 F.3d at 91 ("It may be that the [*Abbasi*] Court simply viewed the failure-to-protect claim as not distinct from the Eighth Amendment deliberate indifference claim in the medical context."); *see also Shorter v. United States*, 12 F.4th 366, 371 (3rd Cir. 2021) ("In *Farmer* . . . the Supreme Court applied *Carlson* in recognizing an Eighth Amendment damages claim"). Other courts have agreed. *See e.g. Walker v. Schult*, 463 F. Supp. 3d 323, 330 (N.D.N.Y. 2020); *McDaniels v. United States*, No. 5:14-cv-02594-VBF-JDE, 2018 WL 7501292, at *5 (C.D. Cal. Dec. 28, 2018); *Fleming v. Reed*, No. EDCV

---

[4] While it has not addressed the issue squarely, the Fourth Circuit has likewise suggested *Farmer* remains a *Bivens* context. *See Attkisson v. Holder*, 925 F.3d 606, 620 at n.6 (4th Cir. 2019), as amended (June 10, 2019) ("The Supreme Court may have recognized a fourth *Bivens* context in *Farmer v. Brennan*, which sustained a prisoner's Eighth Amendment claim for damages against federal prison officials for failure to protect."); *Earle v. Shreves*, 990 F.3d 774, 778 n.1 (4th Cir. 2021) cert. denied, 142 S. Ct. 358 (2021) ("The Court acknowledged that the action [in *Farmer*] was brought under *Bivens*, but did not question the propriety of the *Bivens* remedy in that case.")(citation omitted).

16-0684-PSG (AGR), 2019 WL 4196322, at *3 (C.D. Cal. July 23, 2019); *Lee v. Matevousian*, No. 1:18-cv-00169-GSA-PC, 2018 WL 5603593, at *8 (E.D. Cal. Oct. 26, 2018); *Lineberry v. Johnson*, No. 5:17-04124, 2018 WL 4232907, at *9 (S.D. W. Va. Aug. 10, 2018), *adopted by* 2018 WL 4224458 (S.D. W. Va. Sept. 5, 2018); *Doty v. Hollingsworth*, No. CV 15-3016 (NLH), 2018 WL 1509082, at *3 (D.N.J. Mar. 27, 2018); *Mohamed v. Jones*, No. 20-cv-02516-RBJ-NYW, 2022 WL 523440, at *17–18 (D. Colo. Feb. 22, 2022).

Mr. Marquez's claim is not a new *Bivens* context because it is not "different in a meaningful way from previous *Bivens* cases decided by th[e] Court." 317 S. Ct. at 1859. *Abbasi* laid out a non-exhaustive list of potentially pertinent differences:

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1859–60.

Each of the *Abbasi* factors weighs in favor of finding Mr. Marquez's claim as nearly identical to the claims in *Farmer*. Both are failure-to-protect claims; specifically, both challenged individual federal correctional officials' deliberate indifference to the substantial risk that the incarcerated plaintiff would suffer

23

physical violence at the hands of other incarcerated individuals. In both cases, the risk was obvious because of the plaintiffs' membership in a vulnerable class. In both cases, the defendants were low-level federal correctional officers. As in *Farmer*, Mr. Marquez's claims challenge one-off decisions made with respect to his housing. No special factors exist in Mr. Marquez's case that did not exist in *Farmer*.

The sole distinction is that, because Mr. Marquez was being held pretrial rather than post-conviction, his claim arises under the Fifth Amendment's due process clause, rather than under the Eighth Amendment. But this is a distinction without a difference: caselaw is clear that a pretrial detainee's failure-to-protect claim is identical to that raised by a convicted prisoner, except that the latter must show subjective as well as objective deliberate indifference, whereas the former need only meet the easier-to-satisfy objective test. Indeed, until this Court's decision in *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1068-71 (9th Cir. 2016) (en banc) (overruling *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232 (9th Cir. 2010)), with respect to the deliberate indifference standard for failure-to-protect claims brought by pretrial detainees), the tests are *exactly the same*. The Fifth Amendment showing is a lesser-included test; failures to protect that support Eighth Amendment liability *always*, *necessarily* support Fifth Amendment liability. It would be bizarre indeed to leave pretrial detainees—who have more

24

robust rights—without a remedy when convicted prisoners have one. *See Bistrian*, 912 F.3d at 91 ("[A]pplying *Bivens* to a pretrial detainee's claim under the Fifth Amendment as opposed to a post-conviction prisoner's claim under the Eighth Amendment [does not involve] extending *Bivens* to a new context… [because] the Fifth Amendment provides the same, if not more, protection for pretrial detainees than the Eighth Amendment does for imprisoned convicts.").

II.     **Even if Mr. Marquez's Claim Modestly Extends *Bivens*, No Special Factors Counsel Hesitation Before Recognizing a Cause of Action for Prison Guards' Failure to Protect a Prisoner Against a Substantial Risk of Harm at the Hands of Others.**

A.      **The Ninth Circuit Has Approved of Bivens Extensions Less Modest Than Any Required for Mr. Marquez's Claim to Proceed.**

If a claim presents a new context, the *Abbasi* Court reaffirmed courts' ability to extend the *Bivens* cause of action, directing them to consider whether there are "special factors counselling hesitation in the absence of affirmative action by Congress." *Abbasi*, 137 S. Ct. at 1857 (citing *Carlson*, 446 U.S. at 18). At core, the special-factor analysis "can all be condensed to one concern—respect for the separation of powers." *Hernandez*, 140 S.Ct. at 749. Separation of powers concerns were front and center in the Supreme Court's recent cases, *Abbasi* and *Hernandez*. Those cases, where the Court declined to extend *Bivens*, concerned

25

national-security and border enforcement, respectively; these are exceptional foreign-policy arenas where executive and legislative authority is at its zenith. *See Abbasi*, 137 S. Ct. at 1861; *Hernandez*, 140 S. Ct. at 746. Management of prisons is more mundane—"[the] common and recurrent sphere of law enforcement"—as the *Abbasi* court acknowledged in concluding that a separate, Fifth Amendment conditions claim plaintiffs had raised would be a "modest" extension of *Bivens* and remanding for further consideration of whether such an extension was appropriate. *Abbasi*, 137 S. Ct. at 1861, 1856-1867 (citation and quotation marks omitted).

The special-factors analysis "must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.* at 1857–58. Courts are to conduct an "assessment of [the] impact on governmental operations systemwide" of recognizing a *Bivens* cause of action and are to refrain from doing so "if there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy," such as because alternative remedies are available. *Id.* at 1858.

This Court's recent decision in *Hoffman* demonstrates that even if Mr. Marquez's claim does arise in a new *Bivens* context, a modest extension is warranted. *Hoffman v. Preston*, 26 F.4th 1069 (9th Cir. 2022). The gravamen of Mr. Marquez's claim is, as discussed above, essentially the same as that of the

plaintiff in *Farmer*—both sued officials who failed to protect them from the substantial risk that they would be violently victimized by other incarcerated people based on their membership in a distinct group. By contrast, the plaintiff in *Hoffman* alleged that the defendants had "intentionally and knowingly *created* the risk" that he would be attacked, as distinct from a claim that they had "failed to protect [him] from a known risk of substantial harm." *Id.* at 1063. If any extension is required for Mr. Marquez's claim, it would be even more minimal than the one approved of in *Hoffman*.

This Court has also approved of *Bivens* extensions post-*Abbasi* even for claims that relate to immigration and border enforcement, so long as the plaintiffs are challenging the routine actions of individual rank-and-file officers like Defendants Rodriguez and Kelly, not high-level executive action or legislative policy. *See Lanuza v. Love*, 899 F.3d 1019, 1022 –29 (9th Cir. 2018)( extending *Bivens* to a Fifth Amendment due process claim against an ICE prosecutor who had forged documents in an effort to prevent the plaintiff from obtaining relief in immigration court because the extension did not threaten separation of powers because the defendant was a "low-level federal officer."

## B.   Alternative Remedies Are Not Available.

A key element of the special-factors analysis is whether "Congress has created 'any alternative, existing process for protecting the [injured party's]

27

interest' that itself may 'amount[t] to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Abbasi*, 137 S. Ct. at 1858 (citing *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007). As the Court explained in *Carlson*, defendants must show that the alternative remedy is one that Congress "explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as *equally effective*." 446 U.S. at 18–19 (second emphasis added); *see also Hoffman*, 26 F.4th at 1066 (holding that the availability of other remedies does not caution against expansion when those remedies "do not adequately 'redress [the plaintiff's] alleged harm'") (citation and quotation marks omitted).

Here, the district court correctly concluded that the BOP's internal grievance process was not an alternative remedy for purposes of the *Bivens* special-factors analysis. (ER-25-26.) Also, as a practical matter, Mr. Marquez could not have averted his unconstitutional treatment at the hands of defendants by filing administrative grievances, since he was placed in peril immediately after undergoing each classification interview and tortured by other prisoners "soon after being housed" by Defendant Rodriquez. (ER-104, ¶ 15.)

As this Court recently held in *Hoffman*, "[o]n its face, the grievance process is not intended as a substitute for a federal suit," observing that the PLRA and the Supreme Court have made clear that administrative exhaustion is a necessary

28

precursor to a *Bivens* claims, and its purpose is "*not* to exclude from federal court meritorious claims that cannot be resolved by the grievance process." *Hoffman*, 26 F.4th at 1070 (citing *Porter v. Nussle*, 534 U.S. 516, 524 (2002)). As *Hoffman* explained: "This makes sense: when a prisoner is physically injured due to an officer's unconstitutional actions, the harm can 'only be remedied by money damages,' which are not available through the BOP grievance process." *Id.* (quoting *Bistrian*, 912 F.3d at 92).

Prospective equitable relief was likewise not an alternative remedy for Mr. Marquez, as he seeks to "cure the harm [he] already suffered." *Id.* at 1068. As the Court stated in *Malesko,* "The purpose of *Bivens* is to deter individual federal officers from committing constitutional violations." 534 U.S. at 70. In *Malesko* and *Abbasi*, the plaintiffs sought to challenge institutional policies; the Court found that alternative remedies counseled hesitation in those cases because equitable relief, as opposed to damages, was appropriate for that purpose. *See Malesko*, 534 U.S. at 74; *Abbasi*, at 137 S. Ct. at 1860. Mr. Marquez, though, does not seek to "reform an entity's policies." *Hoffman*, 26 F.4th at 1069. He is simply seeking damages for past harms caused by the actions of individual federal officers, which are "due to their very nature [] difficult to address except by way of damages actions after the fact." *Abbasi*, 137 S. Ct. at 1862; *see also Bivens*, 403 U.S. at 410 (Harlan, J., concurring) (*Bivens* is available for cases in which "it is damages or nothing").

29

Additionally, the district court was correct in finding as a factual matter that Mr. Marquez did not have meaningful access to declaratory, injunctive, or habeas relief. Both times he was put in danger, mere minutes passed between his learning that he would be housed in general population and his placement there, which itself constituted a constitutional injury. *See infra* 54 (explaining that defendants' constitutional violations occurred as soon as they exposed Mr. Marquez to an obvious, substantial risk of harm, although the extent of damages depends on the attack that realized this risk). Moreover, Mr. Marquez was not only endangered but actually attacked soon after being booked into MCC. There was insufficient time for him to challenge his placement in MCC's general population through an action seeking equitable relief. After he returned from the hospital, Defendant Kelly immediately placed Mr. Marquez back into the very same dormitory where he had been attacked. He remained there for only a few weeks before his charges were dropped, mooting any possible equitable claim. *See Hoffman*, 26 F.4th at 1068 (injunctive relief is "ineffective for, and unavailable to" a plaintiff once he is no longer at the same facility or in contact with defendant officers).

Finally, as for the FTCA, defendants sought successfully to dismiss Mr. Marquez's claim, and have therefore conceded that no FTCA alternative was available to him. (AOB 29 n.13.)

30

Appellants have failed to show there were alternative remedial processes available to Mr. Marquez. Instead, it is *Bivens* failure-to-protect claims that have—for decades—served as a check on indifferent federal officers who place detainees in their custody in obvious jeopardy. *See Id.* at 1072 (deterring individual officers from unconstitutional acts is the "central *Bivens* purpose"). "[F]ailing to provide a narrow remedy for such an egregious constitutional violation" as Mr. Marquez has suffered "would tempt other[] [officers] to do the same." *Lanuza*, 899 F.3d at 1034; *see also Abbasi*, 137 S. Ct. at 1856–57 ("*Bivens* does vindicate the Constitution by allowing some redress for injuries, and it provides instruction and guidance to federal law enforcement officers going forward.").

### C.     Legislative Action Does Not Suggest That Congress Does Not Want a Damages Remedy for Failure-to-Protect Claims.

The presence of "legislative action suggesting that Congress does not want a damages remedy" should counsel hesitation at extending the *Bivens* cause of action. *Abbasi*, 137 S. Ct. at 1865. In this case, the opposite has occurred. Congress has legislated based on the understanding that damages claims under *Bivens* against federal prison officers remain viable.

In passing the PLRA, Congress declined to abrogate federal prisoners' ability to bring *Bivens* claims; instead, it sought to disincentivize non-meritorious claims. *See* 42 U.S.C. § 1997e(e) (permitting prisoners to bring civil actions for

31

physical injury and resulting harms); 141 Cong. Rec. H14078-02 (daily ed. Dec. 6, 1995) (statement of Rep. Lobiondo) (discussing the continued validity of *Bivens* claims but advocating for an administrative exhaustion requirement in the PLRA to deter frivolous *Bivens* actions). Congress was aware of the existence of *Bivens* claims for deliberate indifference to a federal prisoners' rights and specifically for failure to protect a federal prisoner from attack; it passed the PLRA 16 years after *Carlson* and 2 years after *Farmer*. *See Lorillard v. Pons*, 434 U.S. 575, 580-81 (1978) (Congress is presumed to legislate with knowledge of Supreme Court decisions). In enacting a far-reaching overhaul of litigation by incarcerated people in this country, Congress did nothing to disturb these precedents. This Court and the Third Circuit have agreed that "'congressional silence in the PLRA about the availability of the *Bivens* remedies' does not suggest that Congress intended to make such remedies unavailable." *Hoffman*, 26 F.4th at 1070 (quoting *Bistrian*, 973 F.3d at 92-93). Congress intended to filter federal prisoners' claims, not bar them. *See id.* at 1071-72 (citing *Bistrian*, 912 F.3d at 93).

Defendants assert—by mischaracterizing the barest of dicta—that because the PLRA does not affirmatively "provide for a standalone damages remedy against federal jailers," this Court should conclude that "Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment." *Abbasi*, 137 S. Ct. at 1865 (as cited at AOB 34-36). There are two

32

problems with this argument. First, the Supreme Court merely indicated that "[i]t could be argued that this suggests" Congressional intent—very far from a holding. *Id.* Rather, for the reasons this Court recently articulated in *Hoffman*, this argument should be rejected. 26 F.4th at 1070 ("We do not dispute that this argument can be made, but we find it unpersuasive."). Second, even if this argument had any merit, it would have no bearing on Mr. Marquez's claim because the landscape of precedent Congress would have surveyed in 1996, when it passed the PLRA, already included *Farmer*. If Congress somehow froze the bounds of permissible *Bivens* claims brought by people in federal custody, those bounds would encompass failure-to-protect claims.

Defendants also suggest that other statutes demonstrate Congress's desire to defer to the Bureau of Prisons regarding housing decisions and therefore somehow signal a preference against *Bivens* damages actions. These arguments fail just as resoundingly. Defendants point to two statutes, 18 U.S.C. §§ 3621(b) and 3625. (AOB 37-38.) These provisions preclude courts from reviewing the merits, and compliance with the Administrative Procedure Act (APA),[5] respectively, of BOP decisions to house prisoners in particular places.[6] But as defendants admit, these

---

[5] If APA review were available to Mr. Marquez, defendants would presumably argue that it constituted an alternative remedy precluding extension of *Bivens*.
[6] Incidentally, defendants' brief misrepresents the first of these provisions. They assert that it "stripped federal courts' jurisdiction to hear challenges to decisions

provisions apply only to those "sentenced to a term of imprisonment," which Mr. Marquez, as a pretrial detainee, was not. (AOB 37-38 n. 17.) Even if these provisions did apply to him, it is not at all clear that the decision to deny Mr. Marquez protective custody or other protection from attack would have been made pursuant to § 3621, rather than to 18 U.S.C. § 4081 (governing "the proper classification and segregation of Federal prisoners according to the nature of the offenses committed [and other factors]"), to which the bars on judicial merits and APA review cited by defendants do not apply. *See Royer v. Fed. Bureau of Prisons*, 933 F. Supp. 2d 170, 181 (D.D.C. 2013).

More importantly: even assuming these provisions applied to Mr. Marquez and were the basis for defendants' decisions not to protect him, their argument would still fail, because these statutes indicate Congressional desire to preclude review only of the merits and procedural adequacy of housing decisions, not of "the constitutionality of the conditions of confinement" arising from these decisions. *Id.* (observing that the Supreme Court concluded in *Webster v. Doe*, 486 U.S. 592, 603-04 (1988), that a similar jurisdiction-stripping provision of the

---

regarding convicted prisoners' place of imprisonment, security designation, programmatic needs, mental and medical health needs, faith-based needs, and other security concerns." (AOB 37.) Actually, it says merely that "a designation of a place of imprisonment under this subsection is not reviewable by any court." 18 U.S.C. § 3621(b). These other subjects are among the factors to be considered by the BOP, *id.*, and are independently the subject of routine and uncontroversial litigation by federal prisoners.

National Security Act did not preclude constitutional challenges); *Washington v. Fed. Bureau of Prisons*, No. CV 5:16-3913-BHH, 2018 WL 6061039, at *3 (D.S.C. Nov. 20, 2018); *Woody v. U.S. Bureau of Prisons*, No. CV 16-862 (DWF/BRT), 2016 WL 7757523, at *3 (D. Minn. Nov. 22, 2016), *report and recommendation adopted*, No. CV 16-862 (DWF/BRT), 2017 WL 150505 (D. Minn. Jan. 13, 2017). To the contrary, the Senate Report from the enactment of § 3625 expressly stated that although the provision was intended to protect the BOP's exercise of discretion, the statute "of course, would not eliminate, and is not intended to eliminate, constitutional challenges by prisoners under the appropriate provisions of law." S. Rep. No. 98-225, at 119 (1983).

Rather than reading the tea leaves of congressional action that does not speak directly to the availability of a damages cause of action for federal prisoners, as defendants urge, this Court should consider Congress's clearest statement on the subject. When Congress amended the FTCA to cover law-enforcement torts in 1973, it rejected a proposal to eliminate *Bivens* actions in favor of suits against the federal government and expressly articulated that these causes of action should operate in parallel. *See Carlson*, 446 U.S. at 19-20; Jack Boger, et al., *The Federal Tort Claims Act Intentional Torts Amendment: An Interpretive Analysis*, 54 N.C. L. Rev. 497, 510-17 (1976); *see also Bistrian*, 912 F.3d at 92 (observing that statute itself, 28 U.S.C. § 2679(b)(2)(A), contemplates the ongoing availability of *Bivens*

remedies). The Senate Report accompanying the FTCA amendment stated that it "should be viewed as a counterpart to the *Bivens* case and its progeny." S. Rep. No. 93-588, at 3 (1973).

### D. Allowing Such Claims to Proceed Does Not Risk Undue Impact on Governmental Operations.

Recognizing Mr. Marquez's claim for damages under *Bivens* will not create a burden on the federal Bureau of Prisons because such claims have long been viable. Under *Farmer* and *Carlson*, claims alleging officers' failure to protect incarcerated people from a substantial risk of serious harm—both from attack, as in *Farmer*, and otherwise—have been treated, for decades, as "garden-variety *Bivens* claims." *Jacobs v. Alam*, 915 F.3d 1028, 1038 (6th Cir. 2019); *see Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980) (holding, over four decades ago, that allegations that federal officers "failed to provide [detainee plaintiff] adequate protection from beatings and sexual attacks" stated a *Bivens* claim); *see also Caldwell v. Warden*, 748 F.3d 1090, 1099-1102 (11th Cir. 2014) (attack by another prisoner); *Smith v. United States*, 561 F.3d 1090, 1104–06 (10th Cir. 2009) (exposure to asbestos); *Benefield v. McDowall*, 241 F.3d 1267, 1272 (10th Cir. 2001) (attack by another prisoner); *Bagola v. Kindt*, 131 F.3d 632, 644-45 (7th Cir. 1997) (workplace hazard).

These claims have not been unworkable, and the Bureau of Prisons has not been inundated by litigation requiring high-level policy changes. Indeed, thanks to the variety of procedural obstacles erected by the PLRA, it has not been inundated even by *Bivens* litigation challenging individual officers' actions. *See* Margo Schlanger, et al., *Incarceration and the Law: Cases and Materials*, Data Updated (April 2022), https://incarcerationlaw.com/resources/data-update/#TableA (one civil rights lawsuit filed per 149 federal prisoners in 2021, as compared to one lawsuit per 95 federal prisoners in 1993). Moreover, federal prisoners bringing *Bivens* claims must generally litigate without counsel; unlike their state counterparts bringing claims under 42 U.S.C. § 1983, they are not entitled to fee-shifting when they prevail. *See Kreines v. United States*, 33 F.3d 1105, 1109 (9th Cir. 1994). Allowing Mr. Marquez's claim to proceed would simply maintain the status quo: a *Bivens* claim is available, albeit challenging to bring successfully, when a federal officer ignores an obvious, serious risk that someone in custody will be assaulted.

**III.     Defendants Are Not Entitled to Qualified Immunity.**

**A.     Qualified Immunity Does Not Protect Defendants Who Violate Clearly Established Constitutional Rights of Incarcerated People.**

Defendants argue that qualified immunity shields them from liability for their failure to protect Mr. Marquez. The district court disagreed, concluding that

37

his complaint alleged that they had violated his clearly established rights. (ER-31-34.)

Qualified immunity shields government officials from liability when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The inquiry comprises two questions: (1) whether the official's violated a constitutional right, and (2) whether the right was "clearly established" at the time of the incident. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). A court may address these questions in either order. *Id.*at 242.

Although "existing precedent must have placed the statutory or constitutional question beyond debate," a case "directly on point" is not required. *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011). A government official can be on notice that his or her actions violate clearly established law "even in novel factual circumstances," and even without a case that had "fundamentally similar" or "materially similar" facts. *Wilk v. Neven*, 956 F.3d 1143, 1148 (9th Cir. 2020) (quoting *Hope v. Pelzer*, 536 U.S. 730 (2002)).

### B. Mr. Marquez Had a Clearly Established Constitutional Right to Be Protected from Violence at the Hand of Other Detainees.

Since at least 1994, the Supreme Court has recognized that incarcerated people have a clearly established right to be protected from a substantial risk of

serious harm at the hands of other detainees. *Farmer v. Brennan*, 511 U.S. 825 (1994). In *Farmer*, the Court held that correctional officials have a duty "to protect prisoners from violence at the hands of other prisoners," explaining that because many people who are incarcerated have "demonstrated proclivities" for violence and all are "stripped [] of virtually every means of self-protection," officials are "not free to let the state of nature take its course." *Id.* at 833. The Court also emphasized that the "substantial risk of serious harm" officials must endeavor to avert need not come from a single or identifiable source, and it does not matter "whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Id.* at 843. *Farmer* clearly established that correctional officials violate the constitutional rights of those they incarcerate when it is obvious that someone in their custody faces a substantial risk of being victimized by other incarcerated people and they fail to take reasonable steps to avert this harm.

Because pretrial detainees—like Mr. Marquez was at the time of the attack—are entitled to even greater protection under the Constitution's due process guarantee than convicted prisoners receive under the Eighth Amendment's prohibition on cruel and unusual punishment, they enjoy a similar clearly established right to be protected from violence. *See Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1067 (9th Cir. 2016) (en banc) ("a pretrial detainee who has not been

convicted of any crime… ha[s] a due process right to be free from violence from other inmates").[7] The distinction is one of mental state: unlike convicted prisoners, pretrial detainees raising failure-to-protect claims need not demonstrate defendants' *subjective* deliberate indifference. *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124 (9th Cir. 2018) (applying an objective deliberate indifference standard).

In *Castro*, the Ninth Circuit explained that a pretrial detainee's right to be protected from violence is violated when "(1) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (2) those conditions put the plaintiff at a substantial risk of serious harm; (3) the defendant did not take reasonable and available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (4) by not taking such measures, the defendant caused the plaintiff's injuries." *Castro*, 833 F.3d at 1071.

Defendants argue that the right articulated in *Farmer* and its progeny and applied to pretrial detainees in *Castro* is not sufficiently specific to be clearly

---

[7] Though *Castro* involved a state pretrial detainee's due process rights under the Fourteenth Amendment, federal pretrial detainees have identical due process rights under the Fifth Amendment. *See Roman v. Wolf,* 977 F.3d 935, 943 (9th Cir. 2020); *Darnell v. Pineiro*, 849 F.3d 17, 21 n. 3 (2d Cir. 2017).

established. (AOB 52-53.) But this Court has repeatedly held to the contrary. *See Id.* at 1067 ("The Supreme Court need not catalogue every way in which one inmate can harm another for us to conclude that a reasonable official would understand that his actions violated" the harmed detainee's rights.); *see also id.* ("The 'contours' of Castro's right were his right to be free from violence at the hands of other inmates . . . [a]ccordingly, we reject the individual defendant's argument that the law on which Castro bases his claim was not clearly established at the time of the incident."); *Wilk* 956 F.3d at 1150 (9th Cir. 2020) ("That right has been clearly established since the Supreme Court's decision in *Farmer*[.]"). Other courts of appeals agree. *See, e.g.*, *Gevas v. McLaughlin*, 798 F.3d 475, 484 (7th Cir. 2015); *Glaze v. Byrd*, 721 F.3d 528, 532 (8th Cir. 2013); *Dennis v. Westchester Cnty. Jail Corr. Dep't*, 485 F. App'x 478, 481 (2d Cir. 2012); *Bishop v. Hackel*, 636 F.3d 757, 772 (6th Cir. 2011).

**C. Defendant Rodriguez Violated Mr. Marquez's Clearly Established Right by Failing to Take Reasonable Measures to Protect Him from an Obvious Risk of Serious Harm.**

In his amended complaint, Mr. Marquez alleged detailed facts sufficient— especially with all reasonable inferences drawn in his favor—to conclude that the risk of serious harm he faced upon initial placement in general population was

41

substantial and obvious.[8] There are at least five allegations related to Defendant

Rodriguez's initial placement interview that together confirm that any reasonable

officer would have appreciated the risk Mr. Marquez faced. First, Defendant

Rodriguez knew that Mr. Marquez had been accused of a sex offense, which is

commonly recognized to put an incarcerated person at significant risk of assault.

(ER-103, ¶¶ 9-11.) Second, Mr. Marquez explicitly and repeatedly expressed grave

concern about being assaulted for this reason and requested protective custody.

(ER-102, ¶ 8; ER-103, ¶ 12.) Third, Defendant Rodriguez acknowledged the

disdain others would feel for Mr. Marquez by making derisive jokes, saying, "what

a great guy" and "what an upstanding citizen." (ER-103, ¶ 9.) Fourth, Defendant

Rodriguez acknowledged the substantial risk Mr. Marquez would face by

instructing him to complete an emergency contact "for when something happens to

you in prison." (ER-103, ¶ 11.) Fifth and most egregiously, Defendant Rodriguez

admitted that he shared Mr. Marquez's belief that his charges would put him at risk

of violence, directing him to lie about them and "tell the other inmates you['re]

---

[8] Defendant Rodriguez does not contest that he made an intentional decision with respect to Mr. Marquez's conditions of confinement by housing him in general population; that placement in general population subjected Mr. Marquez to a substantial risk of serious harm; that there were reasonable measures available to abate that risk, including protective custody; or that the decision to house Mr. Marquez in general population rather than protective custody caused him to be attacked. Instead, Defendant Rodriguez contends only that the risk to Mr. Marquez was not objectively obvious. (AOB 48-51.)

here for selling drugs."[9] (ER-103, ¶ 12.) Defendant Rodriguez recognized the substantial risk of serious harm because it was obvious.

Courts have recognized that some incarcerated people, like Mr. Marquez, face a substantial risk of assault due to their membership in a "particular class of persons"—here, people charged with sex offenses. *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 82 (6th Cir. 1995) (identifying people "exhibit[ing] generally passive personalities" and "small, youthful prisoners" as defined classes of prisoners that a reasonable officer should know were "particularly vulnerable"); *see also Gulatte v. Potts*, 654 F.2d 1007, 1013 n.10 (5th Cir. 1981) (concluding that evidence that officers should have known "that all snitches are in danger from the general prison population" would be sufficient to establish the objective prong of a failure-to-protect claim, even if the plaintiff "failed to indicate he was in fear of his life or to provide [defendants] with a list of potential enemies"). The threat of which a detainee makes officials aware need not be particularized to the individual or come from a specific source. As the Supreme Court explained in *Farmer*, "a prisoner can establish exposure to a sufficiently serious risk of harm by showing that he belongs to an identifiable group of prisoners who are frequently singled out for violent attack by other inmates." 511 U.S. at 843.

---

[9] Lying about one's charges does not, of course, prevent others from discovering the true nature of one's alleged offense. *See Chandler v. Williams*, No. 3:08-CV-00962-ST, 2013 WL 2489139, at *15 (D. Or. June 7, 2013).

43

Incarcerated people who are labeled—through charging or otherwise—as sex offenders are plainly such a vulnerable group. As this Court has long appreciated, it is "hard[] [to] conceive of a state's action bearing more 'stigmatizing consequences' than the labeling of a prison inmate as a sex offender." *Neal v. Shimoda*, 131 F.3d 818, 829 (9th Cir. 1997). *See also Renchenski v. Williams*, 622 F.3d 315, 326 (3d Cir. 2010) (citation and quotation marks omitted)([i]t is largely without question… [that] sex offenders are considered 'an anathema in the inmate subculture . . . [and] inmate norms call for their savage beating.'"); *Williams v. Allison*, No. 1:19-cv-00371-BAM (PC), 2021 WL 5450201, at *9-10 (E.D. Cal. Nov. 22, 2021); *Morris v. Burrkhouse*, No. CV 19-5839-SVW (KK), 2021 WL 2119497, at *4 (C.D. Cal. Mar. 24, 2021), report and recommendation adopted, No. 2:19-CV-05839-SVW-KK, 2021 WL 4786676 (C.D. Cal. May 21, 2021), and report and recommendation adopted, No. CV 19-5839-SVW (KK), 2021 WL 2109198 (C.D. Cal. May 25, 2021) (allegation that "identifi[cation] to the entire prison population as [a] sex offender" subjected plaintiff to a "global threat on his life" was sufficient to establish objective element of Eighth Amendment claim); *Nailing v. Fosterer*, No. CIV S-09-2475-MCE (CMK), 2012 WL 1130655, at *8 (E.D. Cal. Mar. 2, 2012)(finding that an Eighth Amendment deliberate indifference claim had been sufficiently pled because "a reasonable jury could conclude that defendants were deliberately indifferent to the

generally known risk sex offenders face in the prison general population"); *Riggs v. Berkebile*, 427 F. Supp. 3d 1266, 1270-71, 1273 (D. Mont. 2019) (concluding, based in part on evidence that the incarcerated plaintiff had informed defendants that he was at risk of assault "because of his status as a sex offender" and that "it was common knowledge that all sex offenders who lived in C-Pod were the target of violence," that a jury could find that defendants should have understood the risk of harm).

Mr. Marquez's claim is not, however, predicated only on an assertion that the risk he faced due to his charges was common knowledge. His second pertinent allegation is that he expressly and repeatedly alerted Defendant Rodriguez to that risk. (ER-103, ¶¶ 9-12.) Courts have credited such warnings by incarcerated plaintiffs or others demanding protection from established that the risk they faced was obvious. *See, e.g.*, *Wilk* 956 F.3d at 1149 (defendant attended a meeting where plaintiff "express[ed] his fear"); *Riggs*, 427 F. Supp. 3d at 1273 (plaintiff "discussed his safety concerns with prison officials"); *see also Glaze v. Byrd*, 721 F.3d 528, 530 (8th Cir. 2013) (plaintiff's cellmate told a guard that "there are people in here talking about hurting him"). Especially given that Mr. Marquez was assaulted shortly after booking, "[i]t is difficult to imagine what more an unrepresented [detainee] could do to make [jail] officials aware of [his] risk of []

45

assault" than repeatedly telling officers about the risk he faced and repeatedly requesting transfer to a safer housing unit. *Shorter* 12 F.4d at 374.

In addition to his repeated pleas for protection, Mr. Marquez alleged in his complaint several other facts from which a jury could readily conclude that the risk he faced when Defendant Rodriguez placed him in general population was obvious. (ER-103, ¶¶ 9-12.) Each is a statement by the officer himself, acknowledging the obviousness of the risk. Defendant Rodriguez, like any reasonable officer, knew that someone charged with a sex offense would be at a high risk of violent attack. He understood—because it was obvious—that other detainees would see Mr. Marquez as the opposite of a "great guy" and an "upstanding citizen." (ER-103, ¶ 9.) He understood—because it was obvious—that Mr. Marquez should anticipate "something happen[ing] to [him]" that required an emergency contact. (ER-103, ¶ 11.) And he understood—again, because it was obvious—that if others found out about Mr. Marquez's charges, he would likely be brutalized. Defendant Rodriguez was right on all counts.

Defendants offer two arguments in response. First, they contend that the risk Mr. Marquez faced when Defendant Rodriguez placed him in general population was too "speculative" to support liability. (AOB 50-51.) But the cases they cite in support are readily distinguishable. Although the plaintiff in *Smith* told defendants that he "did not want to be returned" to the Kern Valley facility where he was

subsequently attacked and indicated that he had been in a riot there during a previous stint, he did not identify any reasons that he would be at risk in the future. *Smith v. Torres*, No. 1:16-cv-01924-LJO-JDP, 2019 WL 4139275, at *1-2 (E.D. Cal. Aug. 30, 2019). Moreover, he mentioned "several other violent encounters at other facilities" in which he had been involved and claimed that he was placed at risk of harm by the department of corrections generally. *Id.* at 2. It is no surprise that the magistrate judge considering the motion for summary judgment in *Smith* concluded that alerting prison officials to such a diffuse risk across California's prison system was insufficient to place them on notice that he would likely be assaulted in a particular facility.

In the other case Defendants cite on this point, *Brooks v. Warden*, 800 F.3d 1295 (11th Cir. 2015), the risk of harm was slim. Although the plaintiff relayed threats made by another prisoner to defendants, both were held in solitary confinement and they "had [n]ever been out of their cells simultaneously." *Id.* at 1298-99. Only when a maintenance error led to 32 cells being open simultaneously, precipitating a riot, were the plaintiff and the prisoner who had threatened him together "in an unsupervised and chaotic environment where an attack could occur." *Id.* at 1301. The risk of this "freak accident[]" was fairly understood to be a "mere possibility," too insubstantial to support liability. *Id.* at 1301-02.

47

Second, defendants cite a handful of unpublished cases from other circuits to argue that detainees do not have a clearly established right to be placed in protective custody upon request. (AOB 49-50 n.22.). This, as the preceding discussion has shown, is a strawman. Mr. Marquez does not suggest that he had a right to be placed in protective custody simply because he asked for it. Instead, he relies on longstanding caselaw to argue that when a substantial risk of serious harm is objectively obvious to officers, they have a clearly established constitutional obligation to make reasonable efforts—including, but not necessarily limited to protective custody—to avert it.

Moreover, the cases they cite have either have no bearing here or are of no help to them. One, *Powell v. Sheriff, Fulton Cty. Georgia*, 511 F. App'x 957 (11th Cir. 2013) (unpublished), involved no failure-to-protect claim at all; instead, pretrial detainee plaintiffs raised a Fourth Amendment challenge to strip searches conducted prior to placement into general population. They asserted that they should have been held separately pending release, to avoid being strip searched rather than to avoid any risk of harm. *Id.* The court noted in passing that they had no right to avoid placement in general population on that basis. *Id.* The second case defendants cite, *Shields-Nordness v. Galindo*, No. 18-CV-1426 (PJS/DTS), 2019 WL 1003114, at *7 (D. Minn. Mar. 1, 2019), is a similar jail strip-search case that is irrelevant for the same reasons. Their third case, *Hundley v. Parker*, 69 F.3d 537

48

(6th Cir. 1995) (unpublished), concerns a right that is neither the one Mr. Marquez asserts nor even the one that Defendants pretend he asserts. *Id.* at *5-6. The plaintiff there asserted that the defendants violated his rights simply by housing him with someone who had previously been in general population. *Id.* at *1. The court granted qualified immunity, observing that there was no clearly established right to "be housed separately from inmates who had previously been general population prisoners." Id. at *6. But this case has no impact here, since Mr. Marquez does not make any similar allegations.

> **D.    Defendant Kelly Violated Mr. Marquez's Clearly Established Right by Failing to Take Reasonable Measures to Protect Him from an Obvious and Already Realized Risk of Serious Harm.**

Upon his return from the hospital, Mr. Marquez plainly remained at substantial risk of serious harm. Defendant Kelly knew that he had just suffered an attack and sustained life-threatening injuries. (ER-109 ¶ 30; ER-110 ¶ 34.) She placed him back into the same general population dormitory and exposed him to the same risk of violence as before. (ER-109, ¶ 30.) Now, however, Defendant Kelly knew two additional things that Defendant Rodriguez had not. First, Defendant Kelly knew that the risk of violence—formerly substantial but still hypothetical—had in fact been realized. (ER-109, ¶ 30.) *See Riggs*, 427 F. Supp. 3d at 1273 (holding that "any reasonable official" would have understood he or she was violating the Eighth Amendment by returning a prisoner to the housing unit

49

where he had been assaulted, albeit years earlier); *Wilk*, 956 F.3d 1143 (holding

that the plaintiff faced a substantial risk of serious harm when he was moved only

one unit over from an inmate who had threatened to attack him). Moreover,

Defendant Kelly knew that Mr. Marquez was especially vulnerable, given his

existing illness, to grave medical consequences. (ER-109, ¶ 30-34.)

**IV.      Mr. Marquez Alleges Injuries Caused by Defendant Kelly's Decision to Return Him to General Population After His Return from the Hospital Sufficient to Support Liability.**

Perhaps because the risk to Mr. Marquez was at this point so obvious,

Defendants do not seriously dispute that Defendant Kelly's decision to place him

back in general population subjected him to a substantial risk of serious harm any

reasonable officer would have appreciated. Instead, they argue that because he was

not attacked again and did not suffer new injuries, she can face no liability for this

constitutional violation. (AOB 57.) This argument fails for three reasons:

Defendants (1) confuse constitutional injury for physical injury, (2) dismiss his

allegations of ongoing physical injury, and (3) disregard precedent holding that

non-physical injury is sufficient to establish liability.

First, defendants rely on a Seventh Circuit decision, *Babcock v. White*, 102

F.3d 267, 272 (7th Cir. 1996), in which that court suggested that a plaintiff's "fear

of assault" and resulting "psychological injury" did not entitle him to damages in

50

the absence of an actual attack. According to Defendants, failure-to-protect claims

can only succeed when the failure has in fact resulted in violence. Their reliance is

misplaced, and their conclusion is wrong. The Seventh Circuit has since concluded

that this statement in *Babcock* was dicta and "abandoned" it. *Calhoun v. DeTella*,

319 F.3d 936, 941-42 (7th Cir. 2003); *Dorsey v. Washington*, No. 14 C 7627, 2017

WL 4741104, at *3 (N.D. Ill. Oct. 20, 2017) ("The Seventh Circuit once held this

position . . . but it has abandoned this rule[.]").[10]

Rightly so—this conclusion was starkly at odds with Supreme Court

precedent. In *Helling v. McKinney*, the Court held that the Constitution "protects

against future harm to inmates." 509 U.S. 25, 33 (1993); *see also Benefield v.

McDowall*, 241 F.3d 1267, 1271-72 (10th Cir. 2001) (rejecting federal prison

officials' reliance on *Babcock* as in conflict with *Helling*). There, liability attached

to exposure to second-hand smoke and the attendant risk of lung disease,

regardless of whether it manifested in a particular plaintiff. *Farmer* affirmed this

---

[10] Two unpublished cases cited by Defendants rely on *Babcock* and are unpersuasive for that reason. *Brown v. Scott*, 720 F. App'x 296, 298 (7th Cir. 2017); *Monroe v. Heinlen*, No. CV 14-03202-SJO (DFM), 2015 WL 5576430, at *4 (C.D. Cal. Aug. 17, 2015). One of them, *Brown*, emphasizes that "[a]ll that [the plaintiff] alleges is his fear." 720 F. App'x at 298. An incarcerated plaintiff who is baselessly afraid may have no claim. Here, however, Mr. Marquez alleges much more than feelings—he alleges that Defendant Kelly disregarded an objectively substantial risk of serious harm. Because his fear was well-founded, and because any reasonable officer in Defendant Kelly's position would have understood that it was well-founded, his claim should proceed.

principle in the failure-to-protect context, holding that an incarcerated plaintiff was not required to "await a tragic event" like an assault to get relief. 511 U.S. at 845. As one of the cases Defendants themselves cite acknowledges, "physical harm" need not "actually exist[]" if it is "imminent," or if physical harm has occurred in similar circumstances, because imminence or past occurrence is sufficient to show risk. *See Green v. City of New York Dep't of Corr.*, No. 06CIV.4978(LTS)(KNF), 2008 WL 2485402, at *6 (S.D.N.Y. June 19, 2008) *see also Helling*, 509 U.S. at 33 (describing as sufficiently imminent a harm that is likely to occur in "the next week or month or year"). Mr. Marquez suffered a constitutional injury caused by Defendant Kelly when she subjected him to a substantial risk of being assaulted again. Though he might be entitled to more compensatory damages if he had indeed been attacked a second time, his good fortune in avoiding another assault that was objectively likely to happen does not protect her from liability.

Defendants also cite *Gaut v. Sunn*—a brief per curiam opinion decided before the Supreme Court held in *Helling* that the Constitution protects against future harm—for the proposition that it "trivializes the eighth amendment to believe a threat constitutes a constitutional wrong." *Gaut*, 810 F.2d 923, 925 (9th Cir. 1987). Even if *Gaut* remains good law, it does not help Defendants. In that case, the plaintiff alleged that prison guards threatened to retaliate against him for filing a lawsuit; the panel concluded that this was a "mere" threat and did not

violate his right of access to courts, because "a threat to do an act prohibited by the Constitution is [not] equivalent to doing the act itself." *Id.* This may be true when a defendant officer is the one making the threat to assault, but it makes little sense in the context of a failure-to-protect claim, where the defendant officer subjects an incarcerated plaintiff to the threat of violence at the hands of other detainees. In cases like this one, the act of exposing the plaintiff to risk is itself squarely prohibited by the Constitution, and the defendant need do nothing further for the risk to be realized.

Moreover, the panel in *Gaut* was clearly persuaded that the defendants had not taken any concrete steps to put the plaintiff in harm's way; they had simply spoken threatening words. Although the salience of this distinction is not spelled out in detail in the panel's short opinion, it is evident from the case's procedural history. The initial decision in *Gaut v. Sunn*, 792 F.2d 874 (9th Cir. 1986), opinion recalled, 810 F.2d 923 (9th Cir. 1987), was withdrawn. The subsequent decision adopted the view Judge Sneed had expressed in his partial dissent. *Id.* at 877. In that initial opinion, he distinguished a case of "verbal intimidation" from others in which defendants had taken "any overt act intended to reinforce the seriousness of the threat," such as transferring a prisoner to a road gang under supervision of armed guards he had been told would shoot him. *Id.* (distinguishing from *Hudspeth v. Figgins*, 584 F.2d 1345, 1347 (4th Cir. 1978)). Here, Defendant Kelly did much

53

more than merely tell Mr. Marquez that he would be housed in the unit where his attack had occurred—she followed through and put him there. Placing Mr. Marquez back in general population was no mere threat. Once he was housed there, no act of Defendant Kelly's stood between him and further assault.

Second, Defendants contend that Mr. Marquez only plausibly alleged emotional injury following Defendant Kelly's decision to place him back in general population following his return from the hospital. (AOB 54-57.) This argument is in tension with their previous position that Defendant Kelly cannot be liable because no further assault occurred. If that were correct, it would be irrelevant whether the harm Mr. Marquez suffered as a result of exposure to the risk of attack was physical or purely emotional. But regardless, Mr. Marquez did allege, in some detail, physical injury caused by his re-exposure to the danger of further assault. In his complaint, he stated that following his return to general population housing, he experienced not only night terrors, confusion, and restlessness, but also diarrhea, pain in his stomach, back, and testicles, and loss of appetite and weight loss. (ER-109-110, ¶ 32.) Construed in the light most favorable to Mr. Marquez—as is particularly appropriate for a pro se complaint at the motion-to-dismiss stage—he alleged that these symptoms, caused initially by the attack, were exacerbated in seriousness and extended in duration by his renewed presence in a housing unit where he again faced the risk of life-threatening

54

violence. Mr. Marquez had just been informed by a nephrologist that he had almost died. (ER-107-108, ¶ 27.) Physical illness is hardly a surprising reaction to the reasonable expectation that he would be tortured again.

Even if Mr. Marquez had alleged only emotional injury following his return from the hospital, this would be sufficient to support liability. Although the Prison Litigation Reform Act (PLRA)—which defendants do not cite in connection with this argument—does impose a threshold limit on compensatory damages for incarcerated plaintiffs who cannot make "a prior showing of physical injury," 42 U.S.C. § 1997e(e), Mr. Marquez has unquestionably done so: he had just been discharged from the hospital and was still recuperating when Defendant Kelly sent him back into peril.[11] Moreover, regardless of any allegations of physical—or even emotional—injury, he would be entitled to nominal and potentially punitive damages for Defendant Kelly's wanton violation of his constitutional rights. *See*

---

[11] Mr. Marquez plausibly alleges that Defendant Kelly's actions caused his physical symptoms to continue. But he would be eligible for compensatory damages under the PLRA's physical-injury requirement even if his physical injuries were past. *See McAdoo v. Martin*, 899 F.3d 521, 526 (8th Cir. 2018) (holding that the PLRA's physical injury requirement serves a "gatekeeper function against frivolous suits [and] does not require a prison inmate to make a showing of physical injury *caused* by an unconstitutional act"); *Sealock v. Colorado*, 218 F.3d 1205, 1209 n.6 (10th Cir. 2000) (heart attack that occurred prior to any deliberate indifference by defendants satisfied physical-injury requirement).

*Oliver v. Keller*, 289 F.3d 623, 629-30 (9th Cir. 2002); *Rupe v. Cate*, 688 F. Supp.

2d 1035, 1044 (E.D. Cal. 2010).[12]

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's

conclusions that Mr. Marquez's amended complaint properly stated a *Bivens* claim

against both Defendants and that neither is entitled to qualified immunity. It should

remand the case so that the parties can proceed to discovery.


     Respectfully submitted,

| | |
|---|---|
| s/ Oren Nimni | s/ Aaron Littman |
| Oren Nimni | Aaron Littman |
| Samuel Weiss | Hope Bentley (Certified Law Student) |
| RIGHTS BEHIND BARS | Ronak Patel (Certified Law Student) |
| 416 Florida Avenue NW, Ste. 26152 | UCLA SCHOOL OF LAW |
| Washington, D.C. 20001 | PRISONERS' RIGHTS CLINIC |
| (202) 455-4399 | 385 Charles E. Young Drive E |
| | Los Angeles, California 90095 |
| | (310) 825-9562 |

    Dated: April 6, 2022

---

[12] Since Mr. Marquez is certainly eligible to receive some damages from Defendant Kelly, his claims against her should proceed. This Court need not determine, therefore, whether he could recover compensatory damages against her. *See Abreu v. Nichols*, No. 04 CIV. 7778 (DAB)(GWG), 2011 WL 1044373, at *4 (S.D.N.Y. Mar. 22, 2011) *report and recommendation adopted*, 2012 WL 1079985 (S.D.N.Y. Mar. 30, 2012) (leaving this question for the finder of fact).

## CERTIFICATE OF COMPLIANCE

I certify that: This brief complies with the type-volume limitation of Circuit Rule 32-1(a) because this brief contains 13,475 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f)). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word with a Times New Roman 14-point font.

/s/Oren Nimni
Oren Nimni
Rights Behind Bars
416 Florida Avenue NW #26152
Washington, D.C. 20001

57

# CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/Oren Nimni
Oren Nimni
Rights Behind Bars
416 Florida Avenue NW #26152
Washington, D.C. 20001
